**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| STEVEN TATE and STEPHEN FLANNERY, individually and on behalf of all others similarly situated, | |
| *Plaintiffs*, | Case No. ___4:21-cv-1285___ |
| v. | **JURY TRIAL DEMANDED** |
| PHILIPS NORTH AMERICA LLC and PHILIPS RS NORTH AMERICA LLC, | |
| *Defendants*. | |

## CLASS ACTION COMPLAINT

Plaintiff Steven Tate ("Plaintiff" or "Plaintiff Tate") and Plaintiff Stephen Flannery ("Plaintiff" or "Plaintiff Flannery") (hereinafter collectively referred to as "Plaintiffs"), individually and on behalf of the class and respective subclasses of all others similarly situated as defined below, for Plaintiffs' complaint against Defendants Philips North America LLC ("Philips NA") and Philips RS North America LLC ("Philips RS") (collectively, Philips NA, and Philips RS are "Philips" or the "Defendants"), allege the following based on (a) personal knowledge, (b) the investigation of counsel, and/or (c) information and belief.

## PARTIES

1.      Plaintiff Tate is, and at all relevant times has been, a citizen of Missouri, residing in Saint Louis County. Plaintiff Tate purchased a Recalled Device, described more fully below, to treat his sleep apnea. Plaintiff Tate is a professional truck driver who requires the use of a CPAP machine to maintain his medical certification regarding his CDL license.

1

2.      Plaintiff Flannery is a citizen of the State of South Carolina. Plaintiff Flannery purchased a Recalled Device, described more fully below, to treat his sleep apnea.

3.      Defendant Philips NA is a Delaware limited liability company with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips Holding USA, Inc. is the sole member of Defendant Philips NA.  Philips Holding USA, Inc. is a holding company incorporated in the State of Delaware. Philips Holding USA, Inc.'s North American corporate headquarters are located at 2 Canal Park, Cambridge, Massachusetts, 02141. Defendant Philips NA is, therefore, a citizen of the state of Delaware and the Commonwealth of Massachusetts.

4.      Defendant Philips RS is a Delaware limited liability company with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206.

**JURISDICTION AND VENUE**

5.      This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class and Subclasses who are diverse from Defendants, and (4) there are more than 100 class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

6.      Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Defendants transact business in this District, a substantial part of the events or omissions giving rise to Plaintiff Tate's claims occurred in this District; and/or because the Defendants caused harm to class members residing in the District.

7.      The Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in this District, and the events giving rise to Plaintiff Tate's claims arise out of and relate to Defendants' contacts with this District. Further, Defendants have transacted business, maintained substantial contacts, purposefully targeted consumers and medical professionals for sales of its devices and/or committed overt acts in furtherance of the unlawful acts alleged in this Complaint in this District, as well as throughout the United States. The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

## **FACT SECTION**

8.      Plaintiffs bring this action individually and on behalf of a proposed class of purchasers and users of Continuous Positive Airway Pressure (CPAP) and Bi-Level Positive Airway Pressure (Bi-Level PAP) devices and mechanical ventilators manufactured by Philips, which contain polyester-based polyurethane sound abatement foam ("PE-PUR Foam") ("Recalled Devices").

9.      On April 26, 2021, Philips made a public announcement disclosing it had determined there were risks that the PE-PUR Foam used in certain CPAP, Bi-Level PAP, and mechanical ventilator devices it manufactured may degrade or off-gas under certain circumstances.

10.      On June 14, 2021, Philips issued a recall in the United States of its CPAP, Bi-Level PAP, and mechanical ventilator devices containing PE-PUR Foam, because Philips had determined that (a) the PE-PUR Foam was at risk for degradation into particles that may enter the devices' pathway and be ingested or inhaled by users, and (b) the PE-PUR Foam may off-gas certain

3

chemicals during operation.[1]  Philips further disclosed in its Recall Notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."[2]

11.      Philips has disclosed that the absence of visible particles in the devices does not mean that PE-PUR Foam breakdown has not already begun. Philips reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").[3]

12.      Prior to issuing the Recall Notice, Philips received complaints regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask). Philips also received reports of headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices.

13.      In its Recall Notice, Philips disclosed that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects. The potential risks of chemical exposure due to off-gassing of PE-PUR Foam in these devices include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

14.      Philips recommended that patients using the recalled CPAP and Bi-Level PAP devices immediately discontinue using their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

---

[1]    *See*, Philips Recall Notice attached hereto as **Exhibit A**.
[2]    *Id.*
[3]    Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

15. Prior to June 14, 2021, Plaintiff Tate purchased a REMstar Pro, DOM, SN P10670463D0FA (2014-01-16) ("Specific Recalled Device") that he used nightly from its date of purchase.

16. Prior to June 14, 2021, Plaintiff Flannery purchased a DreamStation Auto BIPAP with Humidifier, Model No. DOM DSX700H11 (2016-09-15) ("Specific Recalled Device") that he used nightly from its date of purchase.

17. The manuals accompanying Plaintiffs' respective Specific Recalled Device did not contain any language or warnings of health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects. Had Defendants informed Plaintiffs of these risks, Plaintiffs would not have purchased or used the Recalled Devices.

18. Without knowing of the health risks associated with use of the Recalled Devices, Plaintiffs used their respective Recalled Devices regularly to treat the condition for which it was prescribed.

19. Upon information and belief, Plaintiff Tate did not receive a direct notice of the recall letter until October 2021[4]; however, Plaintiff Tate has confirmed that Plaintiff Tate's device is an affected device. Plaintiffs' Counsel has independently confirmed the device was subject to the Recall. *See* **Exhibit C**.

20. On or about June 29, 2021, Plaintiff Flannery received an email[5] from Respshop advising him, in pertinent part of the following:

On June 14, 2021, Philips Respironics announced a voluntarily recall notification (U.S. only) / field safety notice (International Markets) due to two issues related to

[4] See, **Exhibit B**, Notice of Recall to Plaintiff Steven Tate.
[5] See, **Exhibit D**, Notice of Recall to Plaintiff Stephen Flannery.

the sound abatement foam used in specific Philips CPAP/BiPAP devices.

Affected Devices:

| All Devices manufactured before 26 April 2021, All serial numbers | |
|---|---|
| Continuous Ventilator, Minimum Ventilatory Support, Facility Use | E30 (Emergency Use Authorization) |
| Continuous Ventilator (CPAP), Non-life Supporting | DreamStation ASV |
| | DreamStation ST,AVAPS |
| | SystemOne ASV4 |
| | C-Series ASV |
| | C-Series S/T and AVAPS |
| | OmniLab Advanced+ |
| Noncontinuous Ventilator (CPAP) | SystemOne (Q-Series) |
| | DreamStation |
| | DreamStation Go |
| | Dorma 400 |
| | Dorma 500 |
| | REMstar SE Auto |

| All Devices manufactured before 26 April 2021, All serial numbers | |
|---|---|
| Continuous Ventilator, Non-life Supporting | Trilogy 100 |
| | Trilogy 200 |
| | Garbin Plus, Aeris, LifeVent |
| Continuous Ventilator (BiPAP), Minimum Ventilatory Support, Facility Use | A-Series BiPAP Hybrid A30 (not marketed in US) |
| | A-Series BiPAP V30 Auto |
| Continuous Ventilator (BiPAP), Non-life Supporting | A-Series BiPAP Hybrid A40 |
| | A-Series BiPAP V30 |

**If you are not affected by this recall/field safety notice, please ignore this email.**

**If you have the device(s) listed above, please visit the page we compiled for our customers.**

Solutions to Philips' Recall Notification

You will find all information needed regarding how to react to this recall.

You can also register here Respshop Recall Registration Page, and we will submit to Philips for you.

Customers who currently live in other countries, after registering here, will need to send the machines back to Respshop when instructed to do so. Respshop will forward the old machines to Philips.

Please make sure you register first. Do not just ship your machine to us. We won't be able to track them.

6

Sincerely,

The Respshop Team

21.     The affected devices were subject to a recall due to the presence of a dangerous PE-PUR Foam that could cause Plaintiffs to suffer from adverse health effects, including, *inter alia*, cancer and organ failure.

22.     Plaintiffs have been advised to get a new device; however, they do not have available alternative options for Plaintiffs' respective sleep support and are being forced to continue using their respective device while seeking alternative device options.

23.     As a result of the health risks associated with continued use of these devices andthe recall, Plaintiffs' Specific Recalled Devices are now worthless. Plaintiffs will be forced to replace their respective Recalled Device at considerable cost.

24.     Beyond the damage he suffered from use of the device, Plaintiff Tate expects to incur substantial expense to replace the device.  Plaintiff Tate has experienced chest tightness and respiratory irritants during his useof the Specific Recalled Device. Since being notified of the recall, Plaintiff has experienced anxiety concerning the potential serious health risks he is facing from possible exposure to off- gassed or degraded PE-PUR Foam in the recalled devices.

25.     Beyond the damage he suffered from use of the device, Plaintiff Flannery expects to incur substantial expense to replace the device. Plaintiff Flannery has experienced chest tightness and respiratory irritants during his use of the Specific Recalled Device. Since being notified of the recall, Plaintiff has experienced anxiety concerning the potential serious health risks he is facing from possible exposure to off- gassed or degraded PE-PUR Foam in the recalled devices.

26.     Plaintiffs seek to recover damages based on, *inter alia*, Philips' breach of express

warranty, breach of implied warranties, misrepresentations, omissions, and breaches of state consumer protection laws in connection with its manufacture, marketing and sales of devices containing PE-PUR Foam individually and on behalf of the proposed Class and their respective Subclass(es).

27.    In addition, Plaintiffs seek medical monitoring damages for users of Philips' devices identified in the Recall Notice, who are at risk of suffering from serious injury, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects.

## I.    Continuous Positive Airway Pressure Therapy

28.    Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea. CPAP therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help individuals breathe.

29.    Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health. CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent

interruptions in breathing.

## II.    Bi-Level Positive Airway Pressure Therapy

30.    Bi-Level Positive Airway Pressure ("BiPAP") therapy is a common alternative to CPAP therapy for treating sleep apnea. Similar to CPAP therapy, BiPAP therapy is nonsurgical and involves the use of a nasal or facemask device to maintain air pressure in an individual's airway. BiPAP therapy is distinguishable from CPAP therapy, however, because Bi-Level PAP devices deliver two alternating levels—inspiratory and expiratory—of pressurized air into a person's airway, rather than the single continuous level of pressurized air delivered by a CPAP device. The inspiratory positive airway pressure assists a person as a breath is taken in. Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably breathe out. Bi-Level PAP devices deliver one level of pressurize air (the inspiratory positive level) to assist as a person inhales, and another level (the expiratory level) as a person exhales.

## III.    Mechanical Ventilation

31.    Mechanical ventilation is a treatment to help a person breathe when they find it difficult or are unable to breathe on their own. A mechanical ventilator pushes airflow into the patient's lungs to help them breathe. Mechanical ventilation may be invasive ventilation with a tube inserted into the patient's airway, performed in the intensive care unit in the hospital or a long-term institutional setting. Non-invasive ventilation can be used at home by people with respiratory difficulties.

## SUBSTANTIVE ALLEGATIONS

32.    Philips developed, marketed, and sold a variety of CPAP and Bi-Level PAP respirator devices and mechanical ventilators under its "Sleep & Respiratory Care" segment of its business designed to assist individuals with a number of sleep, breathing, and respiratory

conditions, including obstructive sleep apnea, central sleep apnea, complex sleep apnea syndrome, and Chronic Obstructive Pulmonary Disease (COPD), as well as to assist those individuals requiring invasive and non-invasive ventilators for acute and sub-acute hospital environments. Philips' CPAP and Bi-Level PAP respirator devices and its mechanical ventilatorstypically cost several hundred, if not thousands of dollars. Philips has sold millions of these devices in the United States.

### III.    Philips Sleep & Respiratory Care Devices Endangered Users

33.    On April 26, 2021, in its Quarterly Report for Q1 2021, Philips disclosed for the first time, under a section entitled "Regulatory Update," that device user reports had led to a discovery that the type of PE-PUR Foam Philips used to minimize noise in several CPAP and Bi-Level PAP respirators and mechanical ventilators posed health risks to its users. Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone[], and certain environmental conditions involving high humidity and temperature."[6]

34.    Seven weeks later, on June 14, 2021, Philips announced a recall of numerous models of CPAP and Bi-Level PAP devices, as well as a variety of its mechanical ventilators "to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices."[7]  Specifically, Philip announced that it had determined that the "PE-PUR foam may degrade into particles which may enter the device's air

---

[6]    First Quarter Results, PHILIPS (Apr. 26, 2021),
       https://www.results.philips.com/publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf (accessed June 27, 2021).
[7]    *Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14, 2021),
       https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 27, 2021).

pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals."[8] In total, Philips announced that "[b]etween 3 million and 4 million" devices are targeted in the recall.[9]

35.    The list of the devices recalled by Philips (the "Recalled Devices") include:

| Philips CPAP and Bi-Level PAP Devices Manufactured Before April 26, 2021 Subject to Recall[10] | |
| --- | --- |
| **Device Name/Model Type** | **Type** |
| E30 (Emergency Use Authorization) | Continuous Ventilator, Minimum VentilatorySupport, Facility Use |
| DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| DreamStation ST, AVAPS | |
| SystemOne ASV4 | |
| C Series ASV | |
| C Series S/T and AVAPS | |
| OmniLab Advanced Plus | |
| SystemOne (Q Series) | Non-continuous Ventilator |
| DreamStation | |
| DreamStation GO | |
| Dorma 400 | |
| Dorma 500 | |
| REMStar SE Auto | |

| Philips Mechanical Respirator Devices Manufactured Before April 26, 2021 Subject to Recall[11] | |
| --- | --- |
| **Device Name/Model Type** | **Type** |
| Trilogy 100 Ventilator | Continuous Ventilator |
| Trilogy 200 Ventilator | |
| Garbin Plus, Aeris, LifeVentVentilator | |
| A-Series BiPAP Hybrid A30 | |

---

8    *Id.*

9    Associated Press, *Philips recalls ventilators, sleep apnea machines due to health risks*, NBC NEWS, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (accessed June 27, 2021).

10   Recall Notice (Exhibit "A" hereto); *see also* Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 27, 2021); Philips issues recall notification* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices, https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 27, 2021).

11   *Id.*

| Philips A-Series BiPAP V30 Auto | Continuous Ventilator, Minimum VentilatorySupport, Facility Use |
|---|---|
| Philips A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |
| Philips A-Series BiPAP A30 | |

36.    According to Philips, the PE-PUR Foam used in Recalled Devices puts users at risk of suffering from: "[i]rritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g. kidneys and liver) and toxic carcinogenicaffects."[12]

37.    Philips reported to physicians that PE-PUR Foam particles "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve."[13]

38.    Further, Philips reported that "based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment."[14]

39.    Philips announced that it has received reports of specific complaints from users of Recalled Devices who suffered from "headache[s], upper airway irritation, cough, chest pressure and sinus infection."[15]

### IV.    The Health Risks Associated with Use of the Recalled Devices Renders Them Worthless

40.    As a result of the health risks associated with the use of the Recalled Devices, together with Defendants' concealment of these risks from the date they were first reported to

---

[12]    *Id.*
[13]    Philips *Sleep and Respiratory Care Update – Clinical information for physicians*, June 14, 2021. philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).
[14]    *Id.*
[15]    Recall Notice (Exhibit A hereto).

Defendants or discovered by Defendants through April 26, 2021, the Recalled Devices have been rendered completely worthless or, at the very least, have been substantially diminished in value.

41.    The information described above, including the now-known health risks of Philips CPAP devices, Bi-Level PAP devices and mechanical ventilators, the recall, and the medical warnings and advice issued by Philips, have rendered the Recalled Devices worthless to patients with sleep apnea and respiratory conditions. Individuals not using life-supporting ventilators must immediately discontinue their user of the Recalled Devices or face serious health risks as grave as organ failure or cancer. If they choose to discontinue use of the Recalled Devices they must pay for another expensive device in order to receive effective treatment for their sleep apnea and/or respiratory conditions. Individuals using life-supporting ventilators must seek an alternative treatment before discontinuing use of the Recalled Devices.

42.    Recognizing this, Philips issued the following advice to patients using any of the Recalled Devices:

- "**For patients using BiLevel PAP and CPAP devices:** Discontinue use of affected units and consult with physicians to determine the benefits of continuingtherapy and potential risks."[16]

- "**For patients using life-sustaining mechanical ventilator devices: DO NOT discontinue or alter prescribed therapy, without consulting physicians to determine appropriate next steps.**"[17]

43.    As a result of the above, Plaintiffs and the Class and respective Subclasses will have toundertake considerable expense replacing the Recalled Devices.

## V.    <u>Philips Unreasonably Delayed its Recall</u>

44.    At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose to

---

[16] Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 27, 2021) (Questions and answers) (emphasis in original).
[17] *Id.*

purchasers or users of the Recalled Devices that the PE-PUR Foam contained therein may off-gas or degrade upon use. Similarly, prior to the Update, Philips did not disclose any health risks associated with use of the Recalled Devices.

45.     Defendants have not disclosed when they first discovered or received reports from users of their Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."[18]

46.     At a minimum, as a result of user reports, Defendants were aware of the off- gassing and degradation of the PE-PUR Foam used in the Recalled Devices at some point prior to the recall, yet continued to manufacture and sell the Recalled Devices with such awareness. During this period, Defendants unreasonably and unjustly profited from the manufacture and saleof the Recalled Devices and unreasonably put users of the Recalled Devices at risk of development of serious adverse health effects, including organ failure and cancer.

## TOLLING AND ESTOPPEL

### I.     DISCOVERY RULE TOLLING

47.     Plaintiffs and the Class and Subclasses had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices.

48.     Neither Plaintiffs nor any other members of the Class or Subclasses, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein. Further, Plaintiffs and members of the Class and Subclasses did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

49.     For these, reasons, all applicable statutes of limitation have been tolled by the

---

[18] Recall Notice (Exhibit "A" hereto).

discovery rule with respect to claims asserted by Plaintiffs, the Class, and Subclasses.

## II.    FRAUDULENT CONCEALMENT TOLLING

50.    By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiffs and the members of the Class and respective Subclasses.

51.    Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiffs and members of the Class and respective Subclasses. Plaintiffs and the members of the Class and respective Subclasses were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Class or Subclasses should be tolled.

## CLASS ACTION ALLEGATIONS

52.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). Plaintiffs seek class certification on behalf of a class defined as follows (the "Class"):

> **NATIONWIDE CLASS**: All persons in the United States who purchased or used a CPAP, Bi-Level PAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021.

53.    Plaintiff Tate seeks certification on behalf of a subclass defined as follows (the "Subclass"):

> **MISSOURI SUBCLASS**: All persons who were or are citizens of the State of Missouri who purchased or used a CPAP, Bi-Level PAP,or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021. ("Missouri Subclass")

54.    Plaintiff Flannery seeks certification on behalf of a subclass defined as follows (the "South Carolina Subclass"):

**SOUTH CAROLINA SUBCLASS**: All persons who were or are citizens of the State of South Carolina who purchased or used a CPAP, Bi-Level PAP,or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021.

55.     Plaintiffs reserve the right to modify or refine the definitions of the Class or Subclasses based upon discovery of new information and in order to accommodate any of the Court's manageability concerns (if any).

56.     Excluded from the Class and Subclasses are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class or Subclass; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

57.     **Numerosity (Rule 23(a)(1))**. The Class and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class and Subclasses, as herein identified and described, is not known, but sales figures and the Recall Notice indicate that millions of individuals have purchased the Recalled Devices.

58.     **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclasses members, including the following:

- whether Defendants owed a duty of care to Plaintiffs and the Class and the respective Subclasses;

- whether Defendants knew or should have known that the PE-PUR Foam used for sound abatement posed health risks;

- whether Defendants wrongfully represented that the PE-PUR Foam used for sound abatement in the Recalled Devices was safe;

- whether the Recalled Devices retained any value post-recall;

- whether Defendants wrongfully represented that the Recalled Devices were safe to use;

- whether Defendants wrongfully failed to disclose that the PE-PUR Foam used for sound abatement in the Recalled Devices posed health risks to Recalled Device users;

- whether Defendants' representations and omissions in advertising, warranties, packaging, and/or labeling were false, deceptive, and/or misleading;

- whether those representations and omissions were likely to deceive a reasonable consumer;

- whether a reasonable consumer would consider the presence, or risk of, health risks as a material fact in purchasing one of the Recalled Devices;

- whether Defendants had knowledge that those representations and omissions were false, deceptive, and misleading;

- whether Defendants breached their express warranties;

- whether Defendants breached their implied warranties;

- whether Defendants engaged in unfair trade practices;

- whether Defendants engaged in false advertising;

- whether Defendants' conduct was negligent per se;

- whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions; and

- whether Plaintiffs and the members of the Class and respective Subclasses are entitled to actual, statutory, and punitive damages.

59.    **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Class and respective Subclass. Plaintiffs and members of the Class and respective Subclasses (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Class and Subclasses.

60.    **Adequacy (Rule 23(a)(4))**. Plaintiffs' interests are aligned with the Class and respective Subclasses Plaintiffs seek to represent. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class and Subclasses. Plaintiffs have retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interests of the Class and Subclass. Plaintiffs have no interest that is antagonistic to those of the Class and Subclasses, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class and respective Subclasses.

61.    **Superiority**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class and Subclasses is impracticable. The prosecution of separate actions by individual members of the Class and Subclasses would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class and Subclasses,

and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

62.    **Manageability.** This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

63.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### BREACH OF EXPRESS WARRANTY
### (on behalf of the Class or, alternatively, the Subclasses)

64.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

65.    Philips marketed and sold the Recalled Devices into the stream of commerce with the intent that the Recalled Devices would be purchased by Plaintiffs and the Class and respective Subclass.

66.    Philips expressly warranted, advertised, and represented to Plaintiffs and the Class and the respective Subclasses that the Recalled Devices were safe and appropriate for human use.

67.    Philips made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels. These express warranties became part of the basis of the

bargain that Plaintiffs and the Class and respective Subclasses entered into upon purchasing the Recalled Devices.

68.    Philips' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices, were made in connection with the sale of the Recalled Devices to Plaintiffs and the Class and respective Subclass. Plaintiffs and the Class and respective Subclasses relied on Philips' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use Philips' Recalled Devices.

69.    Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

70.    Philips therefore breached its express warranties by placing Recalled Devices into the stream of commerce and selling them to consumers, when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

71.    Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiffs and members of the Class and respective Subclasses that they were at risk of developing adverse health effects as a result of the dangerous PE-PUR Foam used in the Recalled Devices.

72.    Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and

appropriate for use. Philips thus utterly failed to ensure that the material representations they were making to consumers were true.

73.    The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiffs and members of the Class and respective Subclasses. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiffs and members of the Class and respective Subclasses at the time of purchase of the Recalled Devices.

74.    As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

75.    In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions to induce Plaintiffs and members of the Class and respective Subclasses to rely on such representations and omissions.

76.    Philips' affirmations of fact and promises and its omissions were material, and Plaintiffs and members of the Class and Subclasses reasonably relied upon such representations andomissions in purchasing and using the Recalled Devices.

77.    All conditions precedent to Philips' liability for its breach of express warrantyhave been performed by Plaintiffs or members of the Class or respective Subclasses.

78.    Affording Philips an opportunity to cure its breaches of written warranties would be unnecessary and futile here. Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR Foam in the Recalled Devices was unsafe. Philips had ample opportunity either to stop using the PE-PUR Foam or to replace the PE-PUR Foam in the Recalled Devices to make them safe and healthy for use by Plaintiffs and members of the Class and

respective Subclasses, but failed to do so until now.

79.    As a direct and proximate result of Philips' breaches of express warranty, Plaintiffs and members of the Class and respective Subclasses have been damaged because they did not receive the products as specifically warranted by Philips. Plaintiffs and members of the Class and respective Subclasses did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Recalled Devices.

80.    Plaintiffs and the Class and respective Subclasses seek actual damages, attorneys' fees, costs,and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

## SECOND CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (on behalf of Plaintiffs and the Nationwide Class and the Subclasses)

81.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

82.    Philips are merchants engaging in the sale of goods to Plaintiffs and the Class and respective Subclasses.

83.    There was a sale of goods from Philips to Plaintiffs and the Class and respective Subclasses.

84.    At all times mentioned herein, Philips manufactured or supplied the Recalled Devices, and prior to the time the Recalled Devices were purchased by Plaintiffs and the Class and respective Subclasses, Philips impliedly warranted to them that the Recalled Devices were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmationsof fact and omissions made on the Recalled Devices' labels and packaging, including that the Recalled Devices were safe and appropriate for human use. Plaintiffs and the Class and respective Subclasses relied on Philips' promises and affirmations of fact and omissions when they purchased

and usedthe Recalled Devices.

85.    Contrary to these representations and warranties, the Recalled Devices were notfit for their ordinary use and did not conform to Philips' affirmations of fact and promises and omissions because use of the Recalled Devices is accompanied by the risk of adverse health effects, which does not conform to the labels and packaging of these devices.

86.    Philips breached its implied warranties by selling Recalled Devices that failed to conform to the promises or affirmations of fact made on the packaging or label, as use of each Recalled Devices was accompanied by the risk of developing adverse health effects that do not conform to the packaging or label.

87.    Philips was on notice of this breach, as it was made aware of the adverse health effects accompanying use of the Recalled Devices through user reports submitted to Philips and through lab testing.

88.    Privity exists because Philips impliedly warranted to Plaintiffs and the Class and Subclasses through the warranting, packaging, advertising, marketing, and labeling that the Recalled Devices were natural, and suitable for use to treat health conditions, and made no mention of theattendant health risks associated with use of the Recalled Devices.

89.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and respective Subclasses have suffered actual damages in that each Recalled Device they purchased is worth lessthan the price they paid and which they would not have purchased at all had they known of the attendant health risks associated with the use of each Recalled Device.

90.    Plaintiffs and the Class and respective Subclasses seek actual damages, attorneys' fees, costs,and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their implied warranties and resulting breach.

## THIRD CLAIM FOR RELIEF

**FRAUDULENT MISREPRESENTATION**
**(on behalf of Plaintiffs and the Nationwide Class and the Subclasses)**

91.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

92.     Philips failed to advise Plaintiffs and the Class and respective Subclasses that the Recalled Devices posed serious health risks to their users and Philips falsely represented to Plaintiffs and the Class and respective Subclasses that the Recalled Devices were safe for human use.

93.     Philips intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiffs and the Class and respective Subclasses to purchase the Recalled Devices.

94.     Philips knew that its representations and omissions about the Recalled Devices were false in that the Recalled Devices contained PE-PUR Foam and thus were at risk of causing adverse health effects to users of the Recalled Devices, which does not conform to the products' labels, packaging, advertising, and statements. Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class and respective Subclasses.

95.     Plaintiffs and the Class and respective Subclasses did in fact rely on these omissions and misrepresentations and purchased and used the Recalled Devices to their detriment. Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Recalled Devices, Plaintiffs' and the Class' and Subclasses' reliance on Philips' omissions and misrepresentations was justifiable.

96.     As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and respective Subclasses have suffered actual damages in that they purchased the Recalled Devices

(a) that wereworth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which did not conform to the Recalled Devices' labels, packaging, advertising, and statements.

97.    Plaintiffs and the Class and respective Subclasses seek actual damages, attorneys' fees, costs,and any other just and proper relief available under the laws.

## FOURTH CLAIM FOR RELIEF

### FRAUD BY OMISSION
### (on behalf of Plaintiffs and the Nationwide Class and the Subclasses)

98.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

99.    Philips concealed from and failed to disclose to Plaintiffs and the Class and respective Subclasses that use of Recalled Devices is accompanied by a risk of adverse health effects, whichdoes not conform to the products' labels, packaging, advertising, and statements.

100.    Philips was under a duty to disclose to Plaintiffs and the Class and respective Subclasses the true quality, characteristics, ingredients, and suitability of the Recalled Devices because: (a) Philips was in a superior position to know the true state of facts about its products; (b) Philips was in a superior position to know the risks associated with the use of, characteristics of, and suitability of the Recalled Devices for use by individuals; and (c) Philips knew that Plaintiffs and the Class and respective Subclasses could not reasonably have been expected to learn or discover prior to purchasing the Recalled Devices that there were misrepresentations and omissions by Philips inthe packaging, labels, advertising, and websites regarding the health risks associated with use ofthese devices.

101.    The facts concealed or not disclosed by Philips to Plaintiffs and the Class and respective Subclasses were material in that a reasonable consumer would have considered them

importantwhen deciding whether to purchase the Recalled Devices.

102.    Plaintiffs and the Class and respective Subclasses justifiably relied on Philips' omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associatedwith the use of the Recalled Devices, which is inferior when compared to how the Recalled Devices are advertised and represented by Philips.

103.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and respective Subclasses have suffered actual damages in that they purchased the Recalled Devices (a) that wereworth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks associated with the use of the Recalled Devices, and (c) which do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

104.    Plaintiffs and the Class and respective Subclasses seek actual damages, attorneys' fees, costs,and any other just and proper relief available under the laws.

**FIFTH CLAIM FOR RELIEF**
**NEGLIGENT MISREPRESENTATION**
**(on behalf of Plaintiffs and the Nationwide Class and the Subclasses)**

105.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

106.    Philips had a duty to Plaintiffs and the Class and respective Subclasses to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of theRecalled Devices.

107.    Philips breached its duty to Plaintiffs and the Class by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiffs and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Philips and by failing to promptly remove the Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices.

108.     Philips knew or should have known that the qualities and characteristics of the Recalled Devices were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Philips. Specifically, Philips knew or should have known that:

(a)     the use of the Recalled Devices was accompanied by risk of adverse health effects that do not conform to the packaging and labeling;

(b)     the Recalled Devices were adulterated, or at risk of being adulterated, by the PE-PUR Foam; and

(c)     the Recalled Devices were otherwise not as warranted and represented by Philips.

109.     As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and respective Subclasses have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known they contained PE-PUR Foam that could cause users of the Recalled Devices to suffer adverse health effects, and (c) which do not conform to the products' labels, packaging, advertising, and statements.

110.     Plaintiffs and the Class and respective Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
### (on behalf of Plaintiffs and the Nationwide Class and the Subclasses)

111.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

112.     Plaintiffs and the Class and respective Subclasses conferred substantial benefits on Philips through their purchase of the Recalled Devices. Philips knowingly and willingly accepted and enjoyed these benefits.

113.     Philips either knew or should have known that the payments rendered by Plaintiffs

and the Class and respective Subclasses were given with the expectation that the Recalled Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips. As such, it would be inequitable for Philips to retain the benefit of the payments under these circumstances.

114.    Philips' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiffs and the Class and respective Subclasses.

115.    Plaintiffs and the Class and respective Subclasses are entitled to recover from Philips all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

116.    Plaintiffs and the Class and respective Subclasses seek actual damages, attorneys' fees, costs,and any other just and proper relief available under the laws.

### SEVENTH CLAIM FOR RELIEF

**MEDICAL MONITORING**
**(on behalf of Plaintiffs and the Nationwide Class and**
**the Subclasses, except for Class Members who**
**purchased a Recalled Device for business use only)**

117.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

118.    At all relevant times, the Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed the Recalled Devices into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

119.    Defendants have reported that users of the Recalled Devices face risks of serious injury from the degradation of PE-PUR Foam contained in the Recalled Devices. Degradation of

PE-PUR Foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments in certain regions, and cleaning methods such as ozone may accelerate potential degradation.

120. When PE-PUR Foam degrades into particles that may enter the device's pathway and be ingested or inhaled by users of the devices, users face significantly increased risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of degraded foam exposure include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects.

121. The off-gassing of chemicals from the PE-PUR Foam contained in the Recalled Devices poses risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of exposure to off-gassing from PE-PUR Foam include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

122. The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun. Philips has reported that lab analysis of the degraded foam reveals the presence of harmful chemicals including: TDA, TDI, and DEG.[19] TDI is a powerful irritant to the mucous membranes of the eyes and gastrointestinal and respiratory tracts,[20] and has been reported to cause Occupational Asthma.[21] Exposure to TDA may result in ataxia, tachycardia, nausea, vomiting,

---

[19] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).
[20] The National Institute for Occupational Safety and Health (NIOSH) Current Intelligence Bulletin 53, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, DHHS (NIOSH) Publication Number 90-101 (Dec. 1989); *see also* Gunnar Skarping, *et al., Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*, Dep't of Occupational and Environmental Medicine, University Hospital, S-221 85 Lund, Sweden (1990); https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.
[21] Bernstein, David I, Occupational asthma: Definitions, epidemiology, causes, and risk factors, Wolters Kluwer,

convulsions, and respiratory depression.[22]    TDA can cause chemical cyanosis (*i.e.*, bluish discoloration of the skin) by converting hemoglobin to methemoglobin. This compound can also cause fatty degeneration of the liver.[23]    TDA and TDI are potential carcinogens.[24]    Repeated exposure to DEG has been associated with damage to the kidneys andrenal failure.[25]

123.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been exposed to substantially increased risks of serious injury from off-gassing and/or degradation of PE-PUR Foam in the Recalled Devices, which is beyond normal background levels of risk.

124.    As a direct and proximate result of Defendants' conduct, Plaintiffs have a significantly increased risk of suffering serious injury or contracting a serious latent disease, and suffering further injury at an unknown date in the future. Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

125.    Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR Foam possible. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures includenon-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

---

UpToDate.com (accessed Jun. 30, 2021).
[22] NIOSH, Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity; see also Skarping, Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate; https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.
[23] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.*
[24] *Id.* ("The excess cancer risk for workers exposed to TDI and TDA has not yet been quantified, but the probability of developing cancer should be decreased by minimizing exposure.").
[25] Greg M. Landry, *Diethylene glycol-induced toxicities show marked threshold dose response in rats*, Toxicology and Applied Pharmacology 282 (2015) 244-251 ("DEG has recently been involved in several mass epidemics of renal failure and death world-wide (O'Brien et al., 1998; Schier et al., 2013). DEG poisoning clinically manifests in metabolic acidosis, hepatotoxicity, renal failure, and peripheral neuropathy, with the hallmark being acute renal failure involving proximal tubule cell necrosis and cortical degeneration (Schep et al., 2009)"); Cohen, Jeffrey A., Demyelinating Diseases of the Peripheral Nerves, Nerves and Nerve Injuries (2015) ("When consumed, DEG causes severe systemic and neurologic complications, including coma, seizures, peripheral neuropathy, and hepatorenal failure.").

126.    Existing medical research indicates that exposure to TDI, TDA, and DEG, which Philips has found to exist in off-gassed or degraded PE-PUR Foam, can cause serious, life-threatening and permanent injuries. Philips has received reports from users of the Recalled Devices of headache, upper airway irritation, cough, chest pressure and sinus infection. The exposure to the defects inherent in the Recalled Devices has occurred for users, such as Plaintiffs, but the full extent of the injuries will not manifest until later in the Plaintiffs' lives. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiffs be placed under period diagnostic testing beyond that normally recommended in the absence of use of the Recalled Devices.

127.    Plaintiffs demand judgment against Defendants for medical monitoring damages to diagnose injuries caused by the Recalled Devices at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTH CLAIM FOR RELIEF

### VIOLATION OF THE
### MISSOURI MERCHANDISING PRACTICES ACT, R.S.MO. § 407.010, *et seq.*

#### (On Behalf of Plaintiff Tate and the Missouri Subclass)

128.    Plaintiff Tate incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    Because Plaintiff Tate is a resident and consumer, the Missouri Merchandising Practices Act ("MMPA"), R.S.Mo. § 407.010, *et seq.*, is applicable.

130.    The MMPA provides in pertinent part:

> The act, use of employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce… is declared to be an unlawful practice.

131.    The acts and misconduct of Defendants as alleged above violated the MMPA by, among other things, constituting a deceptive, unfair, and unlawful practice in connection with the sale or advertisement of the Recalled Products, and sale of products are "Merchandise" within the meaning of the MMPA.

132.    The conduct described in this Complaint constitutes a violation of the MMPA.

133.    Defendants, through their employees, agents, and representatives, have violated the MMPA by engaging in unfair, unlawful, and/or deceptive practices, including by making misrepresentations and material omissions for the reasons stated herein.

134.    In particular, the manuals accompanying Plaintiff's Specific Recalled Device did not contain any language or warnings of health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g., kidneys and liver) and toxic carcinogenic effects, and the Specific Recalled Device were defective in that they degraded during normal use.

135.    Defendants intended to be deceptive and unfair to Plaintiff Tate by unfairly and unlawfully representing that the Specific Recalled Device were safe to use.  Defendants continued to make this misrepresentation and material omissions after they knew the Specific Recalled Device were not safe and had health risks associated with use of Specific Recalled Device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g., kidneys and liver) and toxic carcinogenic effects, and the Specific Recalled Device were defective in that they degraded during normal use.

136.    Plaintiff Tate and the Missouri Sub-Class justifiably relied on the misrepresentations and material omissions to their detriment by purchasing Specific Recalled Device. Defendants made no attempt to inform consumers that the Specific Recalled Device were

not safe or had health risks associated with use of the Specific Recalled Device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g., kidneys and liver) and toxic carcinogenic effects, and the Specific Recalled Device were defective in that they degraded during normal use.

137.    Defendants intended for Plaintiff Tate rely upon the material omissions and misrepresentations to induce them to pay and continue to use the Specific Recalled Device.

138.    The material omissions and misrepresentations set forth herein were material to Plaintiff Tate, and if Plaintiff Tate had known of the dangers described here, Plaintiff Tate would not have purchased the Specific Recalled Device.

139.    Without knowing of the health risks associated with use of the Specific Recalled Devices, Plaintiff Tate used his Specific Recalled Devices regularly to treat the condition for which it was prescribed.

140.    Defendants' practice of continuing to manufacture, distribute, and sell Specific Recalled Device after the discovery of the dangers with the product: (1) offends Missouri public policy in part because it violates Missouri Code of State Regulation 12 CSR 10-103.600(3)(A); (2) is immoral, unethical, oppressive, or unscrupulous; and (3) has caused substantial injury to consumers.

141.    As a direct and proximate result of the foregoing, Plaintiff Tate has been damaged in an amount to be determined at trial, including (a) physical injuries and the pain and suffering and emotional distress associated therewith; (b) financial damages; (c) medical bills; and (d) other miscellaneous incidental and consequential damages.

142.    Defendants are liable to Plaintiff Tate and Missouri Sub-Class for damages in amounts to be proven at trial, including attorneys' fees and costs.

143.    As a result of Defendants' misrepresentations and concealment, Plaintiff Tate and the Missouri Subclass members have suffered actual damages in that they have purchased defective Recalled Devices and would have purchased a different device that did not degrade during normal use or had health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g., kidneys and liver) and toxic carcinogenic effects.

144.    As a direct and proximate result of the deceptive, misleading, unfair, and unconscionable practices of the Defendants set forth above, Plaintiff Tate and the Missouri Subclass members are entitled to injunctive relief the Act.

145.    Defendants' deceptive, misleading, unfair, and unconscionable practices set forth above were done willfully, wantonly, and maliciously, entitling Plaintiff Tate and the Missouri Subclass members to an award of attorney fees and costs under the Act.

## EIGHTH CLAIM FOR RELIEF

### VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### S.C. CODE ANN. § 39-5-10, *ET SEQ.*

#### (on behalf of Plaintiff Flannery and the South Carolina Subclass)

146.    Plaintiff Flannery incorporates as if realleged the foregoing paragraphs of this Complaint as if fully set forth herein.

147.    Plaintiff Flannery is a "person" within the meaning set forth in S.C. Code Ann. § 39-5-10, *et seq*.

148.    The transactions between Plaintiff Flannery and Defendants took place in "trade" and "commerce" as defined in S.C. Code Ann. § 39-5-10(b).

149.    Defendants' acts and practices as described herein constitute unfair and deceptive acts or practices in the conduct of trade and commerce as proscribed by S.C. Code Ann. § 39-5-

20(a).

150.     Defendants' actions as described herein constitute a violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 et seq.

151.     Defendants' actions are capable of repetition and, upon information and belief, have been repeated.

152.     Defendants' conduct affects the public interest of the people of South Carolina.

153.     Defendants knew or should have reasonably known that its conduct violated the South Carolina Unfair Trade Practices Act.

154.     As a direct, foreseeable and proximate result of Defendants' unfair and deceptive practices Plaintiff Flannery has suffered actual, direct, incidental, consequential and special damages.

155.     On account of Defendants' actions as described herein, Plaintiff Flannery is entitled to recover treble damages and reasonable attorney fees pursuant to S.C. Code Ann. § 39-5-140(a).

## NINTH CLAIM FOR RELIEF

**VIOLATIONS OF STATE STATUTES
PROHIBITING UNFAIR AND/OR DECEPTIVE
ACTS AND PRACTICES**

**(On Behalf of Plaintiffs and the Nationwide Class and the Subclasses)**

1.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

2.     The state deceptive trade practices acts were enacted by the various states to protect consumers from unfair, unconscionable and deceptive business practices in connection with, inter alia, the sale and/or marketing of goods, products, merchandise, and/or services.

3.     Certain of Defendant's policies and/or practices described in this Complaint

constitute unfair, unconscionable, and/or deceptive trade or business practices in connection with the sale and/or marketing of goods, products, merchandise, and/or services and, thus, constitute violations of the various state consumer protection acts, including, but not limited to: **Alabama**: the Alabama Deceptive Trade Practices Act (Ala. Code §8-19-1 *et seq.*); **Alaska**: Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. §45.50.471 *et seq.*); **Arizona**: the Arizona Consumer Fraud Statute (Ariz. Rev. Stat. Ann. §44-1521 *et seq.*); **Arkansas**: the Arkansas Deceptive Trade Practices Act (Ark. Code Ann. §4-88-101 *et seq.*); **California**: the California Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*), the California Unfair Business Practices Act (California Business & Professions Code §17200, *et seq.*), and the California False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*); **Colorado**: the Colorado Consumer Protection Act (Colo. Rev. Stat. §6-1-101 *et seq.*); **Connecticut**: the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §42-110a *et seq.*); **Washington, D.C.**: the Consumer Protection Procedures Act (D.C. Code Ann. §28-3901 *et seq.*); **Florida**: the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. §501.201 *et seq.* (West)) and the Florida False Advertising Statutes (Fla. Stat. Ann. §817.40 *et seq.* (West)); **Georgia**: Uniform Deceptive Trade Practices Act (Ga. Code Ann. §10-1-370 *et seq.*); the Fair Business Practices Act (Ga. Code Ann. §10-1-390 *et seq.*); and the False Advertising Statute (Ga. Code Ann. §10-1-420 *et seq.*); **Hawaii**: The Hawaii Federal Trade Commission Act (Hawaii Rev. Stat. §480 *et seq.*) and the Uniform Deceptive Trade Practice Act (Hawaii Rev. Stat. §481A *et seq.*); **Idaho**: the Idaho Consumer Protection Act (Idaho Code §48-601 *et seq.*); **Illinois**: the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. §505/1 *et seq.* (Smith Hurd)) and the Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. Ann. 510/1 *et seq.* (Smith Hurd)); **Indiana**: the Deceptive Consumer Sales Act (Ind. Code Ann. §24-5-0.5-1 *et seq.* (Burns)); **Iowa**: the Iowa Consumer Fraud Act (Iowa

Code Ann. §714.16, *et seq.* (West)); **Kansas**: the Kansas Consumer Protection Act (Kan. Stat. Ann. §50-623 *et seq.*); Kentucky: the Consumer Protection Act (Ky. Rev. Stat. §367.110 *et seq.*); **Louisiana**: the Unfair Trade Practices and Consumer Protection Law (La. Rev. Stat. Ann. §51:1401, *et seq.* (West)); **Maine**: the Maine Unfair Trade Practices Act (Me. Rev. Stat. Ann. Tit. 5 §206 *et seq.*) and the Uniform Deceptive Trade Practices Act (Me. Rev. Stat. Ann. Tit. 10 §1211 *et seq.*); **Maryland**: the Maryland Consumer Protection Act (Md. Com. Law Code Ann. §§13-101 *et seq.*, 14-101 *et seq.*); **Massachusetts**: the Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A, *et seq.*); **Michigan**: the Michigan Consumer Protection Act (Mich. Comp. Laws Ann. §445.901 *et seq.*) and the Michigan Pricing and Advertising Act (Mich. Comp. Laws Ann. §445.351 *et seq.*); **Minnesota**: the Consumer Fraud Act (Minn. Stat. Ann. §325 F. 69, *et seq.*); the False Statement in Advertisement Statute (Minn. Stat. Ann. §325 F. 67. *et seq.*); the Uniform Deceptive Trade Practices Act (Minn. Stat. Ann. §325D.44, *et seq.*); and the Unlawful Trade Practices Act (Minn. Stat. Ann. §325D.13, *et seq.*); **Mississippi**: the Consumer Protection Act (Miss. Code Ann. §75-24-1 *et seq.*) and the False Advertising Statutes (Miss. Code Ann. §97-23-3, *et seq.*); **Montana**: the Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. §30-14-101 *et seq.*); and the Statutory Deceit Statute (Mont. Code Ann. §27- 1-712, *et seq.*); **Nebraska**: the Nebraska Consumer Protection Act (Neb. Rev. Stat. §59-1601 *et seq.*) and the Nebraska Uniform Deceptive Trade Practices Act (Neb. Rev. Stat. §87-301 *et seq.*); **Nevada**: the Deceptive Trade Statutes (Nev. Rev. Stat. §§598.0903 *et seq.*, 41.600 *et seq.*); **New Hampshire**: the Regulation of Business Practices for Consumer Protection Act (N.H. Rev. Stat. Ann. §358-A:1 *et seq.*); **New Jersey**: the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §56:8-1 *et seq.* (West)); **New Mexico**: New Mexico Unfair Practices Act (N.M. Stat. Ann. §57-12-1 *et seq.*); **New York**: New York Consumer Protection Act (N.Y. Gen. Bus. Law §§349, 350, *et seq.*

(Consol.)); **North Carolina**: North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §75-1.1 *et seq.*); North Dakota: Deceptive Act or Practice Statutes (N.D. Gen. Stat. §51-15-01 et. seq.); **Ohio**: Ohio Consumer Sales Practices Act (Ohio Rev. Code Ann. §1345.01 *et seq.* (Baldwin)); **Oklahoma**: Oklahoma Consumer Protection Act (Okla. Stat. Ann. Tit. 15, §751 *et seq.* (West)) and the Oklahoma Deceptive Trade Practices Act (Okla. Stat. Ann. Tit. 78, §51 *et seq.* (West)); **Oregon**: the Unlawful Trade Practices Act (Or. Rev. Stat. §646.605 *et seq.*) and the Oregon Food and Other Commodities Act (Or. Rev. Stat. §616.005 *et seq.*); **Pennsylvania**: Unfair Trade Practices Act and Consumer Protection Law (Pa. Stat. Ann. Tit. 73 §201-1 *et seq.* (Purdon); **Rhode Island**: Consumer Protection Act (R.I. Gen. Law §6-13.1-1 *et seq.*); **South Dakota**: South Dakota Deceptive Trade Practices and Consumer Protection Law (S.D. Codified Laws Ann. §37-24-1 *et seq.*); **Tennessee**: Tennessee Consumer Protection Act (Tenn. Code Ann. §47-18-101 *et seq.*); **Texas**: Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code Ann. §17.41 *et seq.* (Vernon)); **Utah**: Utah Consumer Sales Practices Act (Utah Code Ann. §13-11-1 *et seq.*) and the Utah Truth in Advertising Act (Utah Code Ann. §13-11a-1 *et seq.*); **Vermont**: Vermont Consumer Fraud Statute (Vt. Stat. Ann. Tit. 9, §2451 *et seq.*); **Virginia**: Virginia Consumer Protection Act (Va. Code 59.1-196 *et seq.*); **Washington**: Washington Consumer Protection Act (Wash. Rev. Code Ann. §19.86 *et seq.*); **West Virginia**: West Virginia Consumer Credit and Protection Act (W. Va. Code §46A-6-101 *et seq.*); **Wisconsin**: Wisconsin Fraudulent Representations Act (Wis. Stat. Ann. §100.18 *et seq.* (West)); **Wyoming**: Consumer Protection Act (Wyo. Stat. §40-12-101 *et seq.*).

4.    Defendants' practice of continuing to manufacture, distribute, and sell Specific Recalled Device after the discovery of dangers with these products: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) has caused substantial injury to

consumers.

5.      As a direct and proximate result of the foregoing, Plaintiff Tate has been damaged in an amount to be determined at trial, including (a) physical injuries and the pain and suffering and emotional distress associated therewith; (b) financial damages; (c) medical bills; and (d) other miscellaneous incidental and consequential damages.

6.      Defendants are liable to Plaintiffs and the Class and Sub-Classes for damages in amounts to be proven at trial, including attorneys' fees and costs.

7.      These violations have directly, foreseeably, and proximately caused damages to Plaintiffs and the Classes and Subclasses in amounts yet to be determined. They have also unjustly enriched Defendants by an amount yet to be determined.

8.      As a result of Defendants' violations of the Deceptive Trade Practices Acts of the various states prohibiting unfair and deceptive acts and practices, Plaintiffs and members of the Classes have suffered actual damages for which Defendants are liable in an amount up to and equal to threefold damages. Plaintiffs and the Classes are also entitled to recover by disgorgement of profits an amount sufficient to restore to Plaintiffs and the Classes all monies improperly taken from them.

9.      In addition, Plaintiffs and the Classes are entitled to injunctive relief to prevent Defendant from continuing to harm them through its wrongful actions and conduct. As such, Plaintiffs seek an order enjoining Defendants from continuing these unlawful deceptive acts and practices for the reasons stated herein. In particular, the manuals accompanying Plaintiffs' Specific Recalled Device did not contain any language or warnings of health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g., kidneys and liver) and toxic carcinogenic effects.

10.    Had Defendants informed Plaintiffs of these risks, they would not have purchased or used their Specific Recalled Devices.

11.    Without knowing of the health risks associated with use of the Specific Recalled Device, Plaintiffs used their Specific Recalled Device regularly to treat the condition for which it was prescribed.

12.    As a consequence of Defendants' deceptive acts and practices, Plaintiffs and other Class members were injured in fact and suffered an ascertainable loss of monies since the Specific Recalled Device they received were worth less than they paid. As such, in accordance the above indicated consumer protection statutes, Plaintiffs seek actual and punitive damages.

13.    Defendants' deceptive acts and practices are continuing.

14.    Defendants intended for Plaintiffs and the Class and Subclass Members to rely on and accept as true their misrepresentations and concealment in deciding whether to purchase and use the Recalled Devices.

15.    Defendants' misrepresentations and concealment occurred before and during the time Plaintiffs and the Class and Subclasses purchased and used the Recalled Devices.

16.    Defendants' misrepresentations and concealment are material because any reasonable consumer would have considered that the Recalled Devices were defective in that they degraded during normal use.

17.    As a result of Defendants' misrepresentations and concealment, Plaintiffs and the Class and Subclasses have suffered statutory and actual damages in that they have purchased defective Recalled Devices and would have purchased a different device that did not degrade during normal use or had health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other

organs (e.g., kidneys and liver) and toxic carcinogenic effects.

18.    As a direct and proximate result of the deceptive, misleading, unfair, and unconscionable practices of the Defendants set forth above, Plaintiffs and the Class and Subclasses are entitled to injunctive relief the Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Philips as to each and every count, including:

A.    An order certifying this action and the Class and Subclasses requested herein as a class action, designating Plaintiffs as the representative of the Class and respective Subclasses,and appointing Plaintiffs' counsel as counsel to the Class and Subclasses;

B.    An order declaring that Philips' actions constitute: (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) fraudulent misrepresentation; (iv) fraud by omission; (v) negligent misrepresentation; and (vi) unfair and deceptive business practices in violation of the respective consumerprotection statutes, and that Philips is liable to Plaintiffs and the Class and respective Subclasses, as described herein, for damages arising therefrom;

C.    A judgment awarding Plaintiffs and members of the Class and respective Subclasses allappropriate damages in an amount to be determined at trial;

D.    A judgment awarding Plaintiffs and the Class and respective Subclasses medical monitoring damages;

E.    A judgment awarding Plaintiffs and the Class and respective Subclasses prejudgment and post-judgment interest, as permitted by law;

F.    A judgment awarding Plaintiffs and the Class and respective Subclasses costs and fees,including attorneys' fees, as permitted by law; and

H.    Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

**Dated**: <u>October 26, 2021</u>                    Respectfully submitted,

<u>   /s/    Tiffany Marko Yiatras                    </u>
Tiffany Marko Yiatras, 58197MO
**CONSUMER PROTECTION LEGAL, LLC**
308 Hutchinson Road
Ellisville, Missouri 63011-2029
Tele: 314-541-0317
Email: tiffany@consumerprotectionlegal.com

Francis J. "Casey" Flynn, Jr., 52358MO
**LAW OFFICE OF FRANCIS J. FLYNN, JR**
422 South Curson Avenue
Los Angeles, California 90036
Email: casey@lawofficeflynn.com
Tele: 314-662-2836

**ATTORNEYS FOR PLAINTIFFS**